**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **INTELLECTUAL VENTURES II LLC** | § | |
| | § | |
| **v.** | § | |
| | § | **CASE NO. 6:16-cv-81-JRG-KNM** |
| **KEMPER CORPORATION; TRINITY** | § | |
| **UNIVERSAL INSURANCE COMPANY** | § | **JURY TRIAL DEMANDED** |
| **d/b/a KEMPER PREFERRED;** | § | |
| **UNITRIN COUNTY MUTUAL** | § | |
| **INSURANCE COMPANY d/b/a** | § | |
| **KEMPER DIRECT AND KEMPER** | § | |
| **SPECIALTY; CHARTER INDEMNITY** | § | |
| **COMPANY d/b/a KEMPER** | § | |
| **SPECIALTY** | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

This Memorandum Opinion and Order construes the disputed claim terms in United States Patent No. 7,516,177 ("the '177 Patent") asserted in this suit by Intellectual Venture II LLC ("Plaintiff" or "IV") against Defendants[1]. On December 12, 2018, the parties presented oral arguments on the disputed claim terms at a *Markman* hearing. For the reasons stated herein, the Court **ADOPTS** the constructions set forth below.

## BACKGROUND

On February 23, 2016, Plaintiff filed suit against Defendants alleging infringement of the '177 Patent Claims 11-20. *See* Doc. No. 1. On January 17, 2017, the Patent Trial and Appeal Board ("PTAB") entered final written decisions pursuant to *inter partes* review ("IPRs") filed by BITCO General Insurance Corporation that found Claims 11-13 and 15-20 of the '177 Patent invalid. Doc.

---

[1] Defendants are Kemper Corporation, Trinity Universal Insurance Company d/b/a Kemper Preferred, Unitrin County Mutual Insurance Company d/b/a Kemper Direct and Kemper Specialty, and Charter indemnity Company d/b/a Kemper Specialty (collectively, "Defendants").

No. 68 at 3. Subsequently, Claims 11-13 and 15-20 of the '177 Patent were severed into a different cause of action. *See* Doc. No. 83. Accordingly, the sole asserted claim remaining in this case is Claim 14, which is dependent on Claim 11. *See* Doc. No. 83; Doc. No. 104 at 6. The '177 Patent has been subject to two previous claim construction rulings. *See Intellectual Ventures I LLC v. HCC Ins. Holdings, Inc.*, No. 6:16-CV-660, Dkt. No. 102 (E.D. Tex. Aug. 26, 2016); *Intellectual Ventures II LLC v. BITCO Gen. Ins. Corp.*, No. 6:15-CV-00059, Dkt. No. 116 (E.D. Tex. Jan. 11, 2016). The terms of the '177 Patent have also been construed by the PTAB. *See Great W. Cas. Co. v. Intellectual Ventures II LLC*, No. PTAB-IPR2015-01706, Paper No. 30 (Jan. 17, 2017); *Great W. Cas. Co. v. Intellectual Ventures II LLC*, No. PTAB-IPR2015-1707, Paper No. 28 (Jan. 17, 2017); *Oracle America Inc. v. Intellectual Ventures I LLC*, No. PTAB-IPR2016-01434, Paper No. 52 (Jan. 8, 2018).

## APPLICABLE LAW

**Claim Construction**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent.

*Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed.

Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

**Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)**

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. §112(b); 35 U.S.C. § 112, ¶ 2. "A lack of definiteness renders invalid 'the patent or any claim in suit.'" *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 134 S. Ct. 2120, 2125, 189 L. Ed. 2d 37 (2014) (citation omitted). Definiteness requires that a claim must, when "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Id.* at 2129. Whether a claim is

indefinite is determined from the viewpoint of a person skilled in the art at the time the patent was filed. *Id.* at 2128. Indefiniteness is a question of law. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1368 (Fed. Cir. 2013). Indefiniteness is a challenge to the validity of the patent and must be established by clear and convincing evidence. *Nautilus*, 134 S. Ct. at 2130 n.10 (citing *Microsoft Corp. v. i4i Ltd. P'ships*, 131 S. Ct. 2238, 2242 (2011)).

An indefiniteness analysis involves general claim construction principles and begins with the language of the claims. *Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1378 (Fed. Cir. 2017). When a subjective term is used in a claim, "the court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005), *abrogated on other grounds by* 572 U.S. 898, 134 S. Ct. 2120, 189 L.Ed. 2d 37. The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

## ANALYSIS

### I. Agreed Terms in the '177 Patent:

The parties have submitted the following agreed terms (Doc. No. 63-1 at 1-2):

| Term | Agreed Construction |
|---|---|
| "centralized access point of a user" (Claim 11) | A user's network resource that can be used to access content |
| "distributed information access point" (Claims 11-13, 16, 19) | A network resource which is delivered to one or more users and that enables a user to interact with a centralized access point |
| "administrative interface" (Claims 11, 15) | A software management tool that facilitates administrative functions |
| "centralized access point of the particular user" | The particular user's network resource that can be used to access content |

| (Claim 16) | |
|---|---|

In light of the parties' agreements on the proper construction of these terms, the Court

**ADOPTS AND APPROVES** these constructions.

## II.     Disputed Terms in the '177 Patent:

The '177 Patent, filed on June 28, 2004, is entitled "Apparatus for Distributing Content

Objects to a Personized Access Point of a User Over a Network-Based Environment and Method,"

and issued on April 7, 2009. The '177 Patent is a continuation of U.S. Patent No. 6,769,010, which

was filed on May 11, 2000. The Abstract states:

> An apparatus is provided for distributing content objects to a personalized access point of a user over a network-based environment. The apparatus includes a server, a selection client, and a retrieval client. The server includes a database operative to store indicia associated with at least one content object and further operative to store user identifiers as well as information about which content objects have been selected by a particular user. The selection client communicates with the server via a communication link. The selection client is configured to allow a user to select content objects to add to a personalized access point by submitting an indicia and a user identifier to the server. The retrieval client communicates with the server over a communication link allowing a user to retrieve information from a personalized access point. In response to the submission of the indicia and user identifier, at least one of: (a) a content object, and (b) a link to a content object are added to the personalized access point of the particular user and the particular user can retrieve the content object through the personalized access point from the retrieval client. A method is also provided.

Claims 11 and 14 of the '177 Patent recite the following elements (disputed terms

in italics):

> 11. An apparatus for distributing *content* through one or more distributed information access points to a centralized access point of a user, comprising:
> at least one server operative to store one or more of: a) *content*, b) links to *content*, c) information about *content*, and d) information about users including information about which *content* a user has chosen;

a centralized access point of a user accessible via a communications link and operative to provide the user with access to *content* chosen by or for the user;

at least one distributed information access point accessible via a communications link and operative to implement one or more of: a) list one or more *content* objects, b) allow a user to choose *content* for addition to their centralized access point, and c) provide the user with logon access to their centralized access point; and

an administrative interface in communication with the server and operative to create groupings of *content* into one or more distributed information access points;

wherein a user is enabled with the capability to log on to their centralized access point from one or more distributed information access point(s) and access *content* chosen from one or more distributed information access point(s).

14. The apparatus of claim 11 wherein the centralized access point is further operative to enable a user to *manage any content contributed* by them.

### a. "content" (Claims 11, 14)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction necessary. | "Electronic data not including links to content, information about content, and information about users including information about which content a user has chosen" |

At issue is whether the claim term "content" should be construed with the negative limitation of "not including links to content, information about content, and information about users including information about which content a user has chosen."

Plaintiff argues "words of a claim 'are generally given their ordinary and customary meaning.'" Doc. No. 104 at 7 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc)). Plaintiff argues, "content" "has a widely accepted meaning that is not contradicted within the text of the Patent[.]" *Id.* For support, Plaintiff points to the preamble of Claim 11 that

states: "An apparatus for distributing content through one or more distributed information access point to a centralized access point of a user." *Id.* (citing '177 Patent at 55:4-6). Thus, Plaintiff concludes, "the claim language is consistent with content's plain and ordinary meaning of 'substance,' 'meaning,' or 'information.'" *Id.* at 8 (citing Content, https://www.merriam-webster.com/dictionary/content (last accessed Oct. 25, 2018)).

Defendants argue that Plaintiff's plain and ordinary meaning construction "contradicts the position it took in front of the PTAB . . . ." Doc. No. 110 at 2-3. Defendants contend that, in IPR2015-01706, "IV argued that 'the term content cannot be construed so broadly to include the other forms of information separately identified in Claim 11,' including 'links to content,' 'information about content,' and 'information about users including information about which content a user has chosen.'" *Id.* at 3 (citing Doc. No. 110-2 at 33). Defendants argue that "[t]he PTAB agreed with IV and determined that the broadest reasonable construction of the term 'content' excludes 'links to content.'"[2] *Id.* (citing Doc. No. 110-3 at 16-17). Defendants further argue that "[b]ecause the PTAB used the broadest reasonable interpretation standard in construing this term, . . . this Court's construction cannot be broader than the construction adopted by the PTAB." *Id.* at 4 (citing *Facebook, Inc. v. Pragmatus AV, LLC*, 582 Fed. App'x 864, 869 (Fed. Cir. 2014); Doc. No. 110-3 at 16).

The relevant portion of Claim 11 of the '177 Patent, from which Claim 14 depends, recites "at least one server operative to store one or more of: a) content, b) links to content, c) information about content, and d) information about users including information about which content a user has chosen." '177 Patent at 55:7-10. Generally, the use of different terms in a patent's claims

---

[2] Defendants note that "[i]n coming to this construction, the PTAB reasoned that it was only necessary to construe whether 'content' excluded 'links to content' (and not the other forms of information listed in claim 11), because there was no real issue between the parties as to whether the prior art disclosed the other forms of information." *Id.* (citing Doc. No. 110-4 at 7-8).

connotes different meanings. *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different meanings."); *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("[W]e must presume that the use of these different terms in the claims connotes different meanings."); *see also Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention."). Claim 11 separately identifies "content," "links to content," "information about content," and "information about users including information about which content a user has chosen." *See* '177 Patent at 55:7-10. Accordingly, each of the separately identified claim terms are presumed to have different meanings. *See CAE Screenplates Inc.*, 224 F.3d at 1317; *Benton, Dickinson & Co.*, 616 F.3d at 1254.

The specification is consistent with Claim 11 and identifies "content" and "links to content" separately. For example, the specification provides:

> According to one implementation, *the link* corresponding to *a specific content object* is added to the user's personal web page. According to another implementation, *an actual content object* is added to the user's personal web page. In further implementations, *one or more content objects and/or links corresponding with such content objects* are added to a user's personal web page in response in selecting link 222. For example, link 222 may add *a link* and/or a plurality of aggregated *content objects* to a user's personal web page.

'177 Patent at 25:20-28 (emphasis added); *see also* '177 Patent at 6:57-60 ("Furthermore, contributors are given the ability to contribute information by uploading content and/or by distributing links to content . . . ."), 7:11-12 ("In order to organize links and/or uploaded content so that it can be viewed by individuals . . . ."). Accordingly, the specification of the '177 Patent supports a construction where "content" does not include "links to content," "information about

content," and "information about users including information about which content a user has chosen."

Defendants also correctly point out that Plaintiff's plain and ordinary meaning construction contradicts the position Plaintiff took in front of the PTAB. Doc. No. 110 at 2-3 In front of the PTAB, IV argued "the broadest reasonable interpretation of 'content' is 'electronic data embodying information for an individual or individuals, but not including links to content, information about content, and information about users including information about which content a user has chosen.'" Doc. No. 110-2 at 29, 34. Plaintiff argued to the PTAB that "[o]verwhelming legal precedent shows it would be unreasonable to construe content to include things like links to content and information about content, when claim 11 expressly states they are different terms." *Id.* at 31. Plaintiff concluded that "[i]n light of the claim's context, fundamental tenets of construction, simple logic, and the written description, the term content cannot be construed so broadly to include the other forms of information separately identified in claim 11." *Id.* at 34. The PTAB agreed with Plaintiff and construed "content" as "electronic data embodying information for an individual or individuals," and excluding "links to content," but not excluding "content" associated with the "links to content." Doc. No. 110-3 at 17.

Therefore, the intrinsic evidence indicates that "content" should be construed to mean "electronic data embodying information for an individual or individuals." This construction is also consistent with Plaintiff's arguments in front of the PTAB.

Plaintiff's proposed plain and ordinary meaning construction for "content" (*i.e.*, content means substance, meaning, or information) is broader than the PTAB's construction. *See id.* This is significant because it is generally understood that the Court's construction under the *Phillips* standard should not be broader than the construction adopted by the PTAB. *See Facebook, Inc. v.*

*Pragmatus AV, LLC*, 582 Fed. App'x 864, 869 (Fed. Cir. 2014) ("The broadest reasonable interpretation of a claim term may be the same as or broader than the construction of a term under the *Phillips* standard. But it cannot be narrower."). Thus, the Court reject's Plaintiff's proposed plain and ordinary meaning construction of "content."

Finally, the Court declines to adopt Defendants' proposed construction because construing "content" to mean "electronic data not including links to content, information about content, and information about users including information about which content a user has chosen" would be redundant of the claim language.

Therefore, the Court construes **"content"** to mean **"electronic data embodying information for an individual or individuals."** To the extent that Plaintiff contends that "content" may include "links to content," "information about content," and "information about users including information about which content a user has chosen," the Court expressly rejects that argument. However, while "content" does not include the separately identified elements recited above, "content" may include text associated with "links to content."

**b. "contributed" (Claim 14)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction necessary.<br><br>In the alternative, "provided so it is accessible by at least one user other than the contributor" | "additions for distribution to other users" |

The parties dispute whether "contributed" requires the content to be accessible by "other users." Essentially, Defendants' proposed construction would require at least three users: one user contributing the content and two or more "users" receiving the content. In contrast, Plaintiff's

proposed construction would require two users: one contributing the content and "at least one user other than the contributor" receiving the content.

Plaintiff argues: (1) construction of the term "contributed" is not necessary, and the plain and ordinary meaning of the term should prevail; and (2) in the alternative, the Court should follow the PTAB's construction of "content contributions" and "content contributed" meaning "content provided so it is accessible by at least one user other than the contributor." Doc. No. 104 at 8, 11. Plaintiff contends that, "[w]hen considered in the context of claim 14, the plain and ordinary meaning of 'contributed' is: 'content provided so it is accessible by at least one user other than the contributor.'" *Id.* at 9.

The language of Claim 11, from which Claim 14 depends, indicates that one user may provide content to one other user. For example, Claim 11 recites "[a]n apparatus for distributing content . . . comprising: at least one server operative to store . . . information about which content *a user* has chosen." '177 Patent at 55:3-10 (emphasis added). Claim 11 also indicates that the content may be shared with one other user other than the contributor. For example, Claim 11 recites "a centralized access point of *a user* accessible via a communications link and operative to provide the user access to content chosen *by or for the user.*" '177 Patent at 55:11-13 (emphasis added). In other words, the language of Claim 11 indicates that a user may access content contributed by at least one other user, where the other user is recited in dependent Claim 14. Thus, Defendants' proposed construction is inconsistent with the language of Claim 11 because it requires the contributed content be accessible by at least three users: one user contributing the content and two or more users (*i.e.*, "the other users") receiving the content.

The specification of the '177 Patent also does not require "contributed" content to be accessible by two or more users other than the contributor. The specification repeatedly refers to

"a user" or "the user," not "users." For example, the specification provides that "[i]t is further understood that content object *selections made by a user* from any distributed HowZone found on any third-party web site are centrally aggregated into that *user's personal HowZone*." '177 Patent at 43:56-59. Additionally, the specification provides that "*[a] user* accesses any of these content object detail pages by inputting a URL that is provided in a specified format." *Id.* at 43:65-44:2. Similarly, the specification also provides:

> Applicant's web site provides a web-based user selection facility, wherein the entering of indicia 465 selects the associated content objects, and puts links to the content objects in *the user's personal web page*. Optionally, the content objects can be directly distributed to *the user's personal web page* in response to receipt of indicia 465 being delivered from *the user* via appliance 467 and Applicant's web site.

*Id.* at 44:63-45:3 (emphasis added). Thus, the '177 Patent repeatedly refers to "a user" and "the user" and does not require multiple users. Defendants do correctly point out that portions of the specification indicate that information is distributed to "individuals" and "users" in the plural. Doc. No. 110 at 6-7 (citing the '177 Patent at 7:55-59, 6:60-62, 9:39-45). However, the language cited by Defendants does not *require* information to be distributed to "individuals" or "users." (emphasis added). Further, information that is distributed to "individuals" or "users" is not inconsistent with a construction of "contributed" that requires the information to be "accessible by at least one user other than the contributor." Accordingly, the intrinsic record indicates that content "contributed" must only be available to at least one user other than the contributor.

Further, a construction of "contributed" that means "provided so it is accessible by at least one user other than the contributor" is consistent with arguments made by IV in IPR2016-01432. Defendants argue that "IV again tries to sidestep the position it took before the PTAB in arguing that this term should not be construed and should be given its plain and ordinary meaning." Doc. No. 110 at 5, 7-8 (citing Doc. No. 110-6 at 24). For support, Defendants point to Plaintiff's

statement in its Preliminary Response to Petition for IPR where it stated that "the broadest reasonable interpretation of 'contributed' in claims 14 and 15 is 'added for distribution to other users.'" Doc. No. 110-6 at 24. However, Plaintiff clarified its position in its Response to Petition for IPR. There, Plaintiff stated, "the specification's use of approval, administrative edits, and payment concepts is entirely consistent with the *ordinary meaning that contributed content is provided so it is accessible to at least one user other than the contributor* . . . ." Doc. No. 112-1 at 2-3 (emphasis added). Moreover, the final written decision in IPR2016-0143 confirms Plaintiff's position by stating that "Patent Owner asserts that 'content contributed' should be construed as 'content provided so it is accessible by at least one user other than the contributor.'" Doc. No. 104-6 at 17. Thus, Plaintiff's proposed construction is consistent with arguments made before the PTAB. Ultimately, the PTAB construed "content contributed" as "content provided so it is accessible by at least one user other than the contributor." *Id.* at 22.

Accordingly, the intrinsic record supports a construction of "contributed" that requires content be accessible by "at least one user other than the contributor." This is consistent with arguments made before the PTAB and is consistent with the PTAB's construction of "content contributed." Therefore, the Court construes **"contributed"** to mean **"provided so it is accessible by at least one user other than the contributor."**

   c.   **"manage any content" (Claim 14)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. No construction necessary. | Kemper contends that this phrase and Claim 14 are indefinite. |

### i.     The term "manage any content" and Claim 14 are not indefinite

The parties dispute whether the phrase "manage any content" is indefinite for failing to indicate when a determination of whether a user can "manage any content" must be made.

Plaintiff argues that "under the language of the claims, it is objectively discernable what content falls into the class of 'contributed content[,]'" and it will not take the "subjective opinion of whoever may be practicing this invention to determine what content is classified as 'contributed content[.]'" Doc. No. 104 at 12 (citing '177 Patent at 55:4-6). Plaintiff further argues that Claim 14, which recites that a user can "manage any content contributed by them," identifies the content within the class of "contributed content" that can be managed by the user—*i.e.*, "any" content contributed. *Id.* at 14. Plaintiff then notes that the '177 Patent's specification discloses examples of a user managing contributed content. *Id.* at 14-17.

Defendants argue the phrase "manage any content" and Claim 14 are indefinite. Doc. No. 110 at 8. Defendants argue that "[t]he impermissible subjectivity in claim 14 is not found in a term of degree . . . or a term without any meaning." *Id.*   Rather, Defendants argue, "the lack of definiteness is found in the requirement that the user must be able to 'manage any content' that was contributed at some point in the past by that user." *Id.* Defendants contend that "because the intrinsic record does not provide any detail as to *when* a determination of whether a user can 'manage any content' is made, there is a distinct lack of certainty as to the metes and bounds of the claim." *Id.* (emphasis in brief). Defendants explain that the '177 Patent allows certain actions to occur after content is contributed by a user. *See* '177 Patent at 51:51-54 ("Such approval team staff members are provided with the ability to edit the name, description, location within the category network, URL, access fee (if any), and access duration (if limited)."), 51:1-3 ("[A] user may delete any page they have added but no longer want by merely selecting 'delete' link 581."),

46:56-59 ("It is understood that contributions only appear within the listing of FIG. 42 after the contributor has been approved by the staff at Applicant's web site according to the techniques previously described above."). Thus, Defendants argue, because these actions occur after content is contributed by a user, a user may or may not be able to "manage any content" contributed depending on *when* the infringement analysis is conducted. Doc. No. 110 at 11.

In reply, Plaintiff argues that Defendants improperly conflate the idea of "objectivity" with the concept of "definiteness." Doc. No. 112 at 6. Plaintiff contends that something is "objective if it is knowable independent of one's experiences." *Id.* (citing *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1261 (Fed. Cir. 2014); *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1336 (Fed. Cir. 2010)). Plaintiff also contends "something is subjective when it is knowable only through consultation with one's own experiences." *Id.* at 7 (citing *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005)). Accordingly, Plaintiff contends that Defendants' argument fails because the classification of a term as "objective" or "subjective" has nothing to do with "when" the classification takes place. *Id.* at 9.

Claim 14 of the '177 Patent is not subjective because what constitutes "contributed content" is not contingent on the subjective judgment of an individual. Claim 11 explains that content is distributed "through one or more distributed information access points to a centralized access point of a user[.]" '177 Patent at 55:4-6. Claim 14 then recites "[t]he apparatus of claim 11 wherein the centralized access point is further operative to enable a user to manage any content contributed by them." '177 Patent at 55:35-37. As previously discussed, "contributed" means "provided so it is accessible by at least one user other than the contributor." Also, the specification indicates that contributed content is stored on a server. *See* '177 Patent at 46:15-16 ("Applicant's web site stores information about content objects, as well as contributor, in databases."), 46:28-30

("The content upload and delivery system of Applicant's web site supports the upload and storage of web content onto servers at Applicant's web site."). Accordingly, "content" is "contributed" once it is distributed through a "distributed information access point," stored, and provided so it is accessible by at least one user other than the contributor. Therefore, the determination of what constitutes "contributed content" is not contingent on the subjective judgment of an individual. Rather, the content within the class of "contributed content" is objectively discernable. Further, Claim 14 also identifies the class of "contributed content" (*i.e.*, "any") that a user can manage through the centralized access point. *See* '177 Patent at 55:35-37.

The specification also provides an example of a user "manag[ing]" contributed content. The specification explains that "[o]nce a user has volunteered to be a contributor to Applicant's web site . . . a contributor can access their contributions page by way of their personal web page 1198 via link 204." '177 Patent at 46:3-7; *see* '177 Patent at Fig. 40. The specification adds that "[i]f a user wants to manage a content contribution, the user accesses their contributions by selecting link 204," and that "[i]ndividual content object links such as link 254 are displayed within box 212." '177 Patent at 46:8-11. The specification further states that "Applicant's web site stores information about content objects, as well as contributors, in databases," and that "[a]ll access to these databases is implemented by way of a web browser such as Netscape Navigator or Microsoft Internet Explorer." *Id.* at 46:15-18. The specification teaches that "management of this content is done by individual users, using their personal web pages," and it is through their "personal webpage" that a user may access another screen display showing the content the user has contributed to the system. *Id.* at 46:38-52. Figure 42A is an example of the display of a personal webpage and is produced below.



*Id.* at Figure 42A (highlights added).

The specification then states that "[t]he content contributions listing, provided beneath content contributions heading 488, and all related statistics, are stored in a database, and the page which is displayed to a user is dynamically generated, and contains current information." *Id.* at 46:59-63. As illustrated by Figure 42A, each content contribution (*e.g.*, "wireless phone comparisons" or "how to patch drywall") is associated with a corresponding "edit contributions" link (*i.e.*, link 492). Accordingly, "[a] user can select a single, specific contribution which they desire to manage by simply clicking on link 492." *Id.* at 46:54-55. If a user selects such a link, then the user is taken to a screen (illustrated by Figure 43) that allows the user to "manage a contribution that takes the form of a link, or any other type of content object . . . ." *Id.* at 47:28-30, Figure 43. Thus, the "content builder page," illustrated in Figure 43, enables a user to "manage any content contributed." *Id.* at 47:38-52. Finally, after the contributor is finished working on the content, the "information is then stored in a database, and the associated page that a user sees is dynamically generated, with the page containing current information." *Id.* at 47:48-50. Therefore, the

specification provides an example of a centralized access point that is operative to enable a user to manage content contributed.

Further, Defendants point to four cases to support the proposition that where "the infringement analysis hinges on when the analysis should be done, . . . the claim is indefinite." Doc. No. 110 at 11 (citing *Int'l Test Solutions, Inc. v. Mipox Int'l Corp.*, No. 5:13-cv-01567-MRP(Spx), 2017 WL 1367975, at \*6 (N.D. Cal. Apr. 10, 2017); *Vstream Techs, LLC v. PLR Holdings, LLC*, No. 6:15-cv-974-JRG-JDL, 2016 WL 6211550, at \*6-8 (E.D. Tex. Sept. 27, 2016), *report and recommendation adopted*, No. 6:15-CV-974-JRG-JDL, 2016 WL 6159624, \*1 (E.D. Tex. Oct. 24, 2016); *Horizon Pharma Ir. Ltd. v. Actavis Labs., UT, Inc.*, No. 14-7992 (NLH/AMD), 2016 4408990, at \*5-9 (D.N.J. Aug. 17, 2016); *Secor View Techs. LLC v. Nissan North Am., Inc.*, No. 12-3306 (FSH), 2013 WL 6147788, at \*4-5 (D.N.J. Nov. 21, 2013)). However, these cases are factually inapposite for two main reasons.

First, two of the cases cited by Defendants are not applicable because they addressed claim language that included a term of degree. For example, *Vstream Techs, LLC v. PLR Holdings, LLC* involved a decompression program with claims that recited that a second decoding operation would occur only if the first decoding operation was "not sufficiently correct." 2016 WL 6211550, at \*1, \*6. The court determined that the term "sufficiently" was a "term of degree" akin to the word "substantially." *Id.* That court then found "sufficiently correct" to be subjective because "[w]hether a decoding operation is sufficiently correct could presumably differ depending on the subjective preferences of the individual designing the decompression program." *Id.* at \*6. That court reasoned that one "individual might find that an output that is 50% correct is 'sufficiently correct,' while another individual might find that an output must be 75% to be 'sufficiently

correct.'" *Id.* Ultimately, that court found the term to be indefinite because of the "purely subjective" claim term "sufficiently correct." *Id.* at *6, *8.

Similarly, *Secor View Technologies LLC v. Nissan North American, Inc.* involved a rear-view camera system that had claim language that contained a term of degree. No. 12-3306 (FSH), 2013 WL 6147788, at *1, *4 (D.N.J. Nov. 21, 2013). That court explained that "the phrase 'minimize lateral protuberance from the side of the vehicle' is a term of degree. Therefore, the patent must provide 'some standard for measuring that degree.'" *Id.* *4 (citation omitted). After a review of the patent's specification, the court determined that there was no standard for determining when protuberance is "minimized," and, thus, the term was indefinite. *Id.*

Here, in contrast, Claim 14 does not include a term of degree that is purely subjective. Rather, it is objectively discernable whether content has been "contributed" (*i.e.*, "provided so it is accessible by at least one user other than the contributor"), and whether "the centralized access point is further operative to enable a user to manage any content contributed by them." Defendants even state that "[t]he impermissible subjectivity in claim 14 is not found in a term of degree . . . ." Doc. No. 110 at 9. Thus, *Vstream Techs, LLC* and *Secor View Technologies LLC* are distinguishable as they both involved a term of degree.

Second, *Int'l Test Sols., Inc. v. Mipox Int'l Corp.* is not applicable because it involved a claim term that was "inherently time dependent." No. 5:13-cv-01567-MRP(Spx), 2017 WL 1367975, at *6 (N.D. Cal. Apr. 10, 2017). In *Int'l Test Sols., Inc. v. Mipox Int'l Corp.*, the defendant argued the phrase "without modification or damage" lacked an objective boundary and was indefinite. *Id.* There, the patent-at-issue taught "a cleaning pad with micro-features that clean the probes without wear." *Id.* However, the record showed that "material wear is inherently time dependent." *Id.* "Accordingly, probe wear and durability must be framed in some time scale or

cycle count because a competing artisan cannot be subjected to the unpredictable vagaries of the patentee's opinion." *Id.* The court explained that "if [the plaintiff] regards its invention as a device that causes non-negligible wear after 10,000 cleaning cycles, then a competing artisan could use the information to determine whether a device that causes such wear after 20,000 cycles is enough of an improvement to avoid infringement." *Id.* That court, therefore, found that the defendant had satisfied its burden of showing "clearly and convincingly that 'without modification or damage' is indefinite under § 112(2)." *Id.*

Here, in contrast, Claim 14 does not subject a competing artisan to the "unpredictable vagaries of the patentee's opinion." *Id.* As explained previously, it is objectively discernable whether content has been "contributed" (*i.e.*, "provided so it is accessible by at least one user other than the contributor"), and whether "the centralized access point is further operative to enable a user to manage any content contributed by them." Unlike the term in *Int'l Test Sols., Inc.*, "manage any content" is not inherently time dependent. Defendants argue "manage any content" is indefinite because, depending on when the infringement analysis is conducted, the user may not be able to "manage any content" contributed because the content may have been deleted, modified, or not approved. Doc. No. 110 at 11. However, if content has been deleted or is otherwise not "provided so it is accessible by at least one user other than the contributor," then it is not "contributed" content. Thus, the term "manage any content" is not time dependent.[3]

Defendants have failed to show by clear and convincing evidence that Claim 14 is indefinite because, when "viewed in light of the specification . . . , [Claim 14] inform[s] those

---

[3] *Horizon Pharma Ir. Ltd., v. Actavis Labs., UT, Inc.*, is also distinguishable because, there, the court found a term indefinite where "the specification describe[d] two different methods for evaluating 'better drying time,' and the two methods [did] not provide consistent results at consistent times." No. 14-7992 (NLH/AMD), 2016 4408990, at *10 (D.N.J. Aug. 17, 2016). Here, Defendants do not identify any inconsistencies as to what is considered "content contributed." Accordingly, *Horizon Pharma Ir. Ltd.* is also distinguishable.

skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 134 S. Ct. 2120, 2129, 189 L. Ed. 2d 37 (2014).

### ii.    Construction of "any"

Finally, the parties dispute whether "any" means "one" or "some" or whether it means "all."

Plaintiff argues "the plain and ordinary meaning of 'any' is 'one or some indiscriminately of whatever kind.'" Doc. No. 104 at 14 (citing *Any*, https://www.merriam-webster.com/dictionary/any (last accessed October 25, 2018)). Thus, according to Plaintiff, "[m]anagement of a single piece of contributed content suffices as management of 'any' contributed content . . . ." Doc. No. 104 at 14. Plaintiff also argues the specification's use of any is not contrary to its plain and ordinary meaning. *Id.* at 17 (citing '177 Patent 36:65-37:1).

Defendants argue that "the only viable interpretation of 'any' is that a user can manage all content contributed to date." Doc. No. 110 at 13. Defendants contend that "'[c]ontributed' is a past-tense word, and the specification is clear that content must be contributed by a user ***before*** it can be managed." *Id.* (emphasis in brief) (citing '177 Patent at 46:8-14, 46:54-55, Figs. 40, 42A).

Claim 14 recites "[t]he apparatus of claim 11 wherein the centralized access point is further operative to enable a user to manage any content contributed by them." '177 Patent at 55:35-37. As Defendants correctly point out, "contributed" is written in the past tense, and it indicates that content must have been "contributed" by a user before it can be managed. The specification confirms this. *See* '177 Patent at 46:8-14; 46:38-39; 46:54-55, Figs. 40, 42A. The specification also indicates that contributed content is stored on a server. *See* '177 Patent at 46:15-16 ("Applicant's web site stores information about content objects, as well as contributor, in databases."), 46:28-30 ("The content upload and delivery system of Applicant's web site supports

the upload and storage of web content onto servers at Applicant's web site."). Thus, a person of ordinary skill in the art would understand that the user must be able to manage all content contributed by the user that is stored on the server. The specification further states that "[t]he content upload and delivery system of Applicant's web site supports the upload and storage of web content onto servers at Applicant's web site." '177 Patent at 46:28-30. The specification then provides:

> FIG 42 is a diagram of a screen display showing content contributions that a user has made to Applicant's web site. More particularly, FIGS. 40A and 40B, assembled together according to FIG. 41, form another screen which is accessed by selecting link 204 in FIG. 40. Accordingly, a user can visually identify *a listing of all content contributions that they have made,* as well as statistics associated with each of the listings.

'177 Patent at 46:38-45 (emphasis added). Thus, read in context of the claims and the specification, the term "manage any content" indicates that a user must be able to "manage all stored content." [4]

Likewise, other district courts that have considered the term "any" have concluded it is synonymous with "all." *See, e.g., Palmchip Corp. v. Ralink Tech. Corp.*, No. 5:13-CV-01567-MRP(SPx), 2014 WL 12585805, *5-6 (C.D. Cal. Dec. 29, 2014) ("[T]he Court adopts the plain meaning of 'any said peripherals,' which is 'all of the processor's slave peripherals.'"); *Sharper Image Corp. v. Honeywell Int'l, Inc.*, No. C 02-4860 CW, 2005 WL 6219908, at *12 (N.D. Cal. Mar. 21, 2005) ("Because 'the distance' as it is used here contemplates one particular length of space that separates each set of adjacent surfaces, it follows that 'any' means 'each and every' set

---

[4] In a notice of supplemental authority, Defendants submitted the deposition transcript of Edward K.E. Snyders, a co-inventor of the '177 Patent. Therein, Mr. Snyder was asked: "And by the word 'any content' as used in [Claim 14], does that mean that all of the content that they've contributed in the past they can later be able to manage, whether it's a document or a music file or other type of content?" Doc. No. 119-1 at 8:6-11. Mr. Snyder answered affirmatively. *Id.* at 8:13. The Court, however, is not relying on this testimony for its claim construction. *See Howmedica Osteonics Corp. v. Wright Med Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008). Accordingly, Plaintiff's Motion to Strike Defendants' Notice of Supplemental Authority (Doc. No. 124) is **DENIED** as **MOOT**.

of adjacent surfaces. Thus, read in the context of the claim language, the term 'any' means 'each and every.'"); *ABB Atomation Inc. v. Schlumberger Res. Mgmt. Servs., Inc.*, No. CIV.A. 01-077-SLR, 2003 WL 1700013, at *3 (D. Del. Mar. 27, 2003) ("The court shall apply the ordinary definition of the words 'recording' and 'any.' . . . The term 'any' means 'the whole amount of; all.'").

The Court also rejects Defendants' proposed construction of "any" that requires a user to be able to manage "all content contributed to date." The specification of the '177 Patent indicates that contributed content is stored on a server. *See* '177 Patent at 46:15-16, 46:28-30. And, as previously mentioned, a person of ordinary skill in the art would understand that the user must be able to manage all content contributed by the user that is stored on a server. In other words, content that was previously contributed and then later deleted, would no longer be "contributed" content because it is no longer stored or "accessible by at least one user other than the contributor." Defendants' construction would incorrectly require this deleted content to be managed because it could be included within "all content contributed *to date*."

Therefore, the Court construes **"manage any content"** to mean **"manage all stored content."**

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court hereby **ADOPTS** the above claim constructions for the patent-in-suit. For ease of reference, the Court's claim interpretations are set forth in a table in Appendix A.

So ORDERED and SIGNED this 31st day of January, 2019.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

**APPENDIX A**

| Terms, Phrases, or Clauses | Court's Construction |
|---|---|
| '177 Patent (Claims 11, 14)<br><br>"content" | "electronic data embodying information for an individual or individuals" |
| '177 Patent (Claim 14)<br><br>"contributed" | "provided so it is accessible by at least one user other than the contributor" |
| '177 Patent (Claim 14)<br><br>"manage any content" | Not indefinite.<br><br>"manage all stored content" |